**JOHN V. CARR & SON, INC.**
v.
**UNITED STATES.**
C.D. 4377; Protest No. 69/30840.

United States Customs Court,
Third Division.
Sept. 18, 1972.

Howard & Howard, Barnes, Richardson & Colburn, New York City (E. Thomas Honey and Irving Levine, New York City, of counsel), associate counsel, for plaintiff.

E. Grey Lewis, Acting Asst. Atty. Gen. (Robert E. Burke, and Joseph I. Liebman, New York City, trial attorneys), for defendant.

Before RICHARDSON, LANDIS and RE, Judges.

RE, Judge: *

The substantive legal question presented in this case pertains to the lawful and proper import duty to be levied upon certain merchandise imported from Hong Kong.

The merchandise, invoiced as "Pflueger Hande-Pak", consists of lithographed tin containers with forty assorted-sized fish hooks. The fish hooks and the tin sheets were manufactured in the United States and were shipped to Hong Kong. In Hong Kong the tin sheets were cut and shaped into containers. The fish hooks, which were sorted as to size prior to being shipped to Hong Kong, were then packaged into the tin containers. The containers, together with the fish hooks, were reimported into the United States, and consist of the merchandise under protest.

The containers and fish hooks were classified and assessed for duty under item 731.06 of the Tariff Schedules of the United States as "Fish hooks * * Other" at the rate of 27 per centum ad valorem.

---

* The concurrence of Judge Landis in this opinion was obtained on May 5, 1972, and that of Judge Richardson on August 22, 1972. The decision of the Court of Customs and Patent Appeals in National Silver Co. v. United States, 463 F.2d 1387, 59 CCPA, C.A.D. 1064, was issued on August 17, 1972.

Plaintiff does not contest the classification, the assessment of duty on the cost of manufacturing the sheets into containers, or the other listed invoiced costs ("sorting and packaging, labour, packing material and labour"). It does, however, contend that the value of the fish hooks should have been deducted from the total dutiable value of the merchandise since they are entitled to entry free of duty under either of two provisions of the tariff schedules. The first is item 800.00 of the tariff schedules which provides for duty-free status for products of the United States, having been returned after exportation, without having been advanced in value or improved in condition by any process of manufacture or other means while abroad. Alternatively, plaintiff urges that the fish hooks should be duty-free under item 807.00 of the tariff schedules as articles assembled abroad in whole or in part of fabricated components, the products of the United States.

■ The case presents a threshold question that will be dealt with before considering the merits of plaintiff's claims. The merchandise, the subject of this action, was appraised on March 12, 1969, and was liquidated on April 18, 1969, thus raising what has come to be called the "Pistorino" issue. Specifically, this question pertains to the validity of a liquidation which takes place prior to the expiration of the 60-day period allowed under section 501(a) of the Tariff Act of 1930, as amended prior to the Customs Courts Act of 1970,[1] which provides for the filing by the collector of an appeal for reappraisement.

The question, long considered settled, was revived by the Third Division of this court in Pistorino & Co., Inc. v. United States, 65 Cust.Ct. 387, C.D. 4110

(1970). In the *Pistorino* case, the court, *sua sponte,* remanded the case to a single judge pursuant to 28 U.S.C. § 2636(d) to determine the value of the merchandise.[2] It stated the basis for the remand as follows:

"It is noted that liquidation of the involved entry occurred on November 22, 1965, or just 32 days after the merchandise was appraised. As such, appraisement never became final, the time within which the collector might appeal therefrom not having expired at the time of liquidation. Under 19 U.S.C.A., section 1503(a) the collector has but one value upon which he can lawfully assess duty, and that is the final appraised value of the merchandise which does not become final until the expiration of 60 days after the appraisement. Liquidation of an entry prior to the expiration of the time for appeal to reappraisement is null and void. United States v. Boston Paper Board Co., 23 CCPA 372, T.D. 48233 (1936). And the effect of such premature liquidation is to void the appraisement as there was no official act of the collector accepting the appraisement. United States v. Boston Paper Board Co., *supra.* Consequently, the matter must be remanded to a single judge of this court, pursuant to 28 U.S.C.A., section 2636(d) to determine the value of the merchandise herein in the manner provided by law."

Defendant subsequently moved for rehearing, and the motion was granted on June 11, 1971.[3] Pending the Third Division's consideration of the motion, Judge Rao, writing for the Second Division of this court, decided John V. Carr & Son, Inc. v. United States, 66 Cust.Ct. 316, C.D. 4209, 326 F.Supp. 973 (1971). The holding in the *Carr* case, which dealt

---

1. Section 204(a) of the Customs Courts Act of 1970, Pub.L. 91–271, 84 Stat. 283 (1970), provides that the appropriate customs officer may liquidate entries of merchandise immediately upon appraisement, classification and the fixing of the amount of the duty to be paid thereon.

2. The opinion was written by Judge Richardson with whom Judge Landis concurred.

3. Judge Landis and Judge Ford, who was specially assigned to that case to resolve the split, signed the order granting the motion. Judge Richardson dissented.

with the same issue presented in *Pistorino*, may be gleaned from the following quotation from the court's opinion:

"Obviously, if a timely appeal for reappraisement had been filed, the liquidation herein would have been rendered void. That is the situation which existed in a number of cases where the court has stated that the liquidation is void or that the collector has no power to liquidate while an appeal for reappraisement is pending. Stubbs v. United States, 7 Ct.Cust. Appls. 399, T.D. 36967 (1917); United States v. Boston Paper Board Co., *supra;* Lawrence Groom & Co. v. United States, *supra*; The New Home Sewing Machine Co. v. United States, 62 Cust.Ct. 895, R.D. 11655 (1969). See also United States v. European Trading Co., 26 CCPA 103, C.A.D. 1 (1938), where liquidation took place before the time to appeal from a decision of the Customs Court to the Court of Customs and Patent Appeals had expired.

While the word 'void' has been applied to the liquidations in some of the decisions, that term is often used to signify various shades of infirmity from absolutely void for all purposes to merely voidable. Joseph Fischer v. United States, 38 CCPA 143, 150, C.A.D. 452 (1951). In that case the court found it significant that prior decisions had held that insufficient designation of packages to be examined rendered an appraisement null and void rather than void *ab initio*. It concluded that the action of the collector in failing to designate the prescribed number of packages 'may be characterized as an act which he was empowered to perform but which he performed in an improper manner.' It was held that such act, not being void in an absolute sense, did not vitiate the jurisdiction of the court in a reappraisement case.

In the instant case the district director was empowered to liquidate the entry on the basis of the appraised value (absent a timely appeal for reappraisement or a finding of value by the Customs Court or the Court of Customs and Patent Appeals). This he did—the only alleged infirmity being that he did it prior to the expiration of the time during which an appeal might have been filed. The liquidation could have been voided by the filing of a timely appeal by either party. Since in this case none was filed, and the rights of neither party have been prejudiced, the liquidation remains valid." 66 Cust.Ct. at 319–320, 326 F.Supp. at 976.

Shortly thereafter, the First Division of this court, which included this member of the court, decided Bradlow, Inc. v. United States, 66 Cust.Ct. 333, C.D. 4211 (1971). In the *Bradlow* case the court noted the issue presented in the *Carr* and *Pistorino* cases, and unanimously followed the *Carr* case. The First Division also followed the *Carr* case in its later decision in First American Artificial Flowers, Inc. v. United States, 67 Cust. Ct. 164, C.D. 4268 (1971).[4]

On the motion for rehearing in *Pistorino*, Judge Landis reviewed the history of the issue and stated (Judge Ford concurring, Judge Richardson dissenting):

"Persuaded that the *Carr* and *Bradlow* cases are correct upon this issue, we further note that '[a]t the present time, under the Tariff Act of 1930, there is still no provision in the statute setting forth a time limit for the collector to make the liquidation', cf. Dart Export Corp., et al. v. United States, 43 CCPA 64, 75, C.A.D. 610 (1956), certiorari denied 352 U.S. 824, [77 S.Ct. 33, 1 L.Ed.2d 48] (1956). On the strength of the foregoing authorities, we now hold that the collector was empowered to liquidate the

4. To the same effect see opinion of Senior Judge Rosenstein, Judge Landis concurring, in Kotake Co., Ltd., Standard Trading Co., Ltd. v. United States, 67 Cust. Ct. 178, C.D. 4271 (1971); The Young Engineers, Inc. v. United States, 67 Cust. Ct. 190, C.D. 4272 (1971); and Trans-Atlantic Company v. United States, 67 Cust.Ct. 296, C.D. 4288 (1971), appeal pending.

entry on the basis of the appraised value (absent a timely appeal for reappraisement or a finding of value by the Customs Court or the Court of Customs and Patent Appeals). We further hold that the liquidation being voidable rather than absolutely void, said liquidation could have been voided by the filing of a timely appeal by either party. Since none was filed and neither party has been prejudiced, the liquidation remains valid." 67 Cust.Ct. 245, 251, C.D. 4281, 333 F.Supp. 541, 546 (1971).[5]

In the case at bar the two members of the court comprising the Third Division[6] were unable to agree on the determination of the "Pistorino" issue. Consequently, by order of the Chief Judge, this member of the court was assigned to the Third Division for "the special and express purpose only of considering and determining the above entitled action." As in the *Bradlow* case, this member of the court holds the challenged liquidation to be merely voidable. In the case at bar, therefore, since no appeal for reappraisement was filed and since neither party has been prejudiced, the court finds the liquidation to be valid.

■ The legal question presented has been treated at length in the cases cited. It may be well to add, however, that there is still another ground upon which the validity of the action by the liquidating officer may be sustained. This ground, founded upon broad and general principles of administrative law, is deemed worthy of consideration and treatment.

Judge Rao, in the *Carr* case, noted the reasons for the changes in administrative procedures regarding appraisement and liquidation of entries. He observed:

"While it has been customary until recent years to withhold liquidation until the period for appeal has expired, there appears to be no legislative policy in the public interest requiring it. In fact, at the present time there are reasons for the newer procedures.

In a report of the Survey Group which made a management study of the Bureau of Customs, 'An Evaluation of: Mission Organization Management', December, 1964, it is pointed out that about 70 percent of all entries are appraised and liquidated as entered and recommendations were made to speed up procedures in such cases so that 'no change' entries might be considered liquidated 'as entered' without going through the full process of liquidation (pp. VI 46–51).

After the adoption of the Reorganization Plan No. 1 of 1965, 79 Stat. 1317, 89th Cong. 1st Sess. (1965) and the abolition of the offices of collector and appraiser, 100 Treas.Dec. 381, T.D. 56564 (1965), it became the practice of the Bureau of Customs to appraise and liquidate as entered without waiting for the expiration of the appeal period, and to cancel liquidations where appeals were filed, in order to reduce delays without prejudicing the rights of the parties." 66 Cust.Ct. at 320, 326 F.Supp. at 976.

The reorganization plan, which established a new organizational framework in the Bureau of Customs, would permit, as President Johnson stated in his message to Congress submitting the plan, "a needed modernization of the organization *and procedure* of the Bureau of Customs" and "a more effective adminis-

---

5. In National Silver Co. v. United States, 67 Cust.Ct. 262, C.D. 4283, 333 F.Supp. 551 (1971), decided two days after *Pistorino*, the Third Division split again on the same issue, Judge Ford having been specially assigned to resolve the split. [The *National Silver Co.* case was ap-

pealed and affirmed by the Court of Customs and Patent Appeals on August 17, 1972, 463 F.2d 1387, 59 CCPA, C.A.D. 1064.]

6. Judge Richardson and Judge Landis.

tration of the customs laws."[7] (Emphasis added.)

The President, however, emphasized that:[8]

" * * * abolition by Reorganization Plan No. 1 of 1965 of the offices of collector of customs, comptroller of customs, surveyor of customs, and appraiser of merchandise will in no way prejudice any right of any person affected by the laws administered by the Bureau of Customs. The rights of importers and others, for example, before the Customs Court, arising out of the administration of such functions will remain unaffected."

Accordingly, the plan, as adopted, provides *inter alia* that:

"The abolition of offices herein shall not prejudice any right to protest or to appeal to the United States Customs Court any action taken in the administration of the customs laws."

Thus Congress was fully apprised that restructuring of the Bureau would require procedural reforms to obtain "a more effective administration of the customs laws." It was likewise clear that, in order to achieve its stated purpose, new procedures would be adopted as would be deemed necessary by those charged with the responsibility of carrying out the plan. Such changes, of course, would "in no way prejudice any right of any person affected by the laws administered by the Bureau".

Pursuant to the rule-making authority conferred upon him under 19 U.S.C., section 66 [9] and section 624 [10] of the Tariff Act of 1930, the Secretary of the Treasury, in the exercise of his discre-

tion, authorized the procedure utilized in this case. The procedure adopted authorized, in some instances, liquidating entries before the time for filing reappraisement appeals had expired, and canceling or voiding the liquidations if timely appeals were subsequently filed. Parenthetically, it may be observed that the expeditious liquidation of entries does not benefit only the Bureau. It is also advantageous to the importer, who, in obtaining a speedy determination of the duty assessment, is enabled, if he desires, to obtain judicial redress that much sooner by filing a protest as provided by law.

■ Although section 503, prior to its amendment by the Customs Courts Act of 1970, provided that "the basis for the assessment of duties on imported merchandise subject to ad valorem rates of duty shall be the final appraised value", there was no provision in the tariff laws proscribing the Secretary of the Treasury from authorizing liquidation prior to the period allowed in section 501 for filing reappraisement appeals. Differently stated, there was no requirement that the Secretary await the expiration of the 60 days before liquidating the entries.

■■ The Secretary of the Treasury adopted the new policy pertaining to liquidations in order to carry out the statutory mandate of the Reorganization Plan. In doing so it must be assumed that he acted lawfully and in compliance with the applicable provisions of the Tariff Act of 1930, as amended. As stated by the Supreme Court "[t]he presumption of regularity supports the

---

7. Message submitting Reorganization Plan No. 1 of 1965, March 25, 1965, U.S.Code Cong. & Admin.News, 89th Cong., 1st Sess., 1965, Vol. 2, p. 4442.

8. Ibid.

9. Sec. 66 provides:
 "The Secretary of the Treasury shall prescribe forms of entries, oaths, bonds, and other papers, and rules and regulations not inconsistent with law, to be used in carrying out the provisions of law relating to raising revenue from imports,

or to duties on imports, or to warehousing, and shall give such directions to collectors and prescribe such rules and forms to be observed by them as may be necessary for the proper execution of the law."

10. Sec. 624 provides:
 "In addition to the specific powers conferred by this Act the Secretary of the Treasury is authorized to make such rules and regulations as may be necessary to carry out the provisions of this Act."

official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Chemical Foundation, Inc., 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926). To the same effect see United States v. State of Washington et al., 233 F.2d 811, 816 (9th Cir. 1956) (presumption that "the ordinary course of business was followed and that the law was obeyed; also that official duty was regularly and faithfully performed"); Hull v. Continental Illinois National Bank & Trust Co., 177 F.2d 217, 220 (7th Cir. 1949) ("acts of an administrative body, including its orders and directives, are presumably correct"); La Porte et al. v. Bitker, 145 F.2d 445, 447 (7th Cir. 1944) ("a presumption of regularity * * must be accorded the acts of a government official"). For the specific application of the presumption of regularity in customs cases see Sanji Kobata et al. v. United States, 66 Cust. Ct. 341, 344–345, C.D. 4213, 326 F.Supp. 1397, 1399–1400 (1971).

■ By the application of any appropriate standard of judicial review, it can not be said that the Secretary's action, and his construction of the pertinent legislation, were so impermissible as to be declared void. Apart from the administrative advantages which must have induced its promulgation, it is clear beyond doubt that the rights of no person were prejudiced by the new policy. Indeed, it must be said that the policy has a rational and ample basis in law and fact. See National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 132, 135, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

■ General principles of administrative law teach that the courts have been ever loath to disturb the administrative acts and rulings of responsible officials who possess a special knowledge and competence in particular areas of government. This judicial reluctance is manifest in a very large number of cases that need not be cited. More recently,

the Supreme Court has declared that "[w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman et al., 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

■ Accordingly, the courts have stated that "due regard must be given to the integrity of the administrative function. Given a range of reasonable alternatives, the administrator is given the task of selecting the one which, in his judgment, is most appropriate. In such circumstances, the court must defer to his judgment." Corn Products Company v. Department of H., E., & W., Food & D. Admin., 427 F.2d 511, 515 (3d Cir. 1970), cert. denied, Derby Foods, Inc. v. F. D. A., U. S. Dept. of H., E., W., 400 U.S. 957, 91 S.Ct. 354, 27 L.Ed.2d 265 (1970). Thus it is settled that on the legal question of statutory interpretation, the experienced judgment of the public agency or commission charged with the responsibility of administering the statute will be given great weight. Power Reactor Development Co. v. International Union of Electrical, Radio and Machine Workers, AFL–CIO, et al., 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); Board of Governors of Federal Reserve System et al. v. Agnew et al., 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408 (1947); National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); United States et al. v. American Trucking Associations, Inc., et al., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Tobin v. Flour Mills of America, Inc., 185 F.2d 596 (8th Cir. 1950); Brooks Transportation Co., Inc., et al., v. United States et al., 93 F.Supp. 517 (D.C.Va., E.D., 1950), aff'd, 340 U.S. 925, 71 S.Ct. 501, 95 L.Ed. 668 (1951).

■ Clearly, in a case where the statute is reasonably susceptible of the interpretation adopted by the agency, the court will sustain that construction, even though the court might have reach-

ed a different conclusion had the issue initially arisen judicially. See Unemployment Compensation Commission of Alaska et al. v. Aragon et al., 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 36 (1946); Brawner Building, Inc., et al. v. Shehyn et al., 442 F.2d 847 (D.C.Cir. 1971); Securities and Exchange Commission v. Talley Industries, Inc., 399 F.2d 396 (2d Cir. 1968), cert. denied, General Time Corp. v. Securities and Exchange Commission, 393 U.S. 1015, 89 S.Ct. 615, 21 L.Ed.2d 560 (1969); Chapman et al. v. Santa Fe Pacific R. Co. et al., 198 F.2d 498 (D.C.Cir. 1952), cert. denied, 343 U.S. 964, 72 S.Ct. 1058, 96 L.Ed. 1361 (1952).

The foregoing authorities require that great deference and weight be given to the Secretary's construction of the pertinent statutory provisions. Hence, the procedure authorized and utilized in the case at bar should not be rendered void unless it can be said that it was without a rational basis in law. As shown by the conflicting views of this court on the threshold question presented, reasonable men differ on the construction of the statute under review. This internal conflict lends support to the application of the principles of administrative law enunciated in the cases cited. Under the circumstances presented the interpretation of the agency administering the statute ought not to be disturbed unless it can be shown to be "beyond the permissible limits of administrative interpretation." Social Security Board v. Nierotko, 327 U.S. 358, 370, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946). Certainly, whatever error or procedural irregularity may be perceived is not of such a nature as to warrant the drastic consequences urged by those who would declare the Secretary's ruling null and void. In the absence of any claim, much less proof, of prejudice by the parties, such a result would be unwarranted and not in the public interest.

 Indeed, it is well settled that procedural irregularities in administrative proceedings must be prejudicial to a party in order to justify judicial intervention. Couto v. Shaughnessy, 218 F.2d 758 (2d Cir. 1955), cert. denied, 349 U.S. 952, 75 S.Ct. 879, 99 L.Ed. 1276 (1955). The fact that some irregularity or error may have been committed by an agency does not of itself warrant reversal. Kerner v. Celebrezze, 340 F.2d 736 (2d Cir. 1965), cert. denied, 382 U.S. 861, 86 S.Ct. 121, 15 L.Ed.2d 99 (1965). See National Labor Relations Board v. Seine and Line Fishermen's Union of San Pedro, 374 F.2d 974 (9th Cir. 1967), cert. denied, Biazevich v. N. L. R. B., 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 261 (1967).

The doctrine of prejudicial error, as applicable to administrative action, is pertinent to the case at bar. Neither party was injured by the Bureau's procedural changes and the statutory rights of the parties were in no may abrogated by the expedited liquidation. Accordingly, it is the determination of the court that since no appeal for reappraisement was filed, the liquidation is valid.

Proceeding to the substantive legal issues presented, the pertinent provisions of the tariff schedules may be set forth as follows:

*Classified under:*

Schedule 7, Part 5, Subpart B:

"Fish hooks, including snelled hooks:

\* \* \* \* \* \* \* \*

731.06 Other .................... 27% ad val."

*Claimed under:*

Schedule 8, Part 1:

*"Part 1 headnotes:*

1. In the absence of a specific provision to the contrary, the tariff status of an article is not affected by the fact it was previously imported into the customs territory of the United States and cleared through customs whether or not duty was paid upon such previous importation.

2. Any product of the United States which is returned after having been advanced in value or improved in condition abroad by any process of manufacture or other means, or any imported article which has been assembled abroad in whole or in part of products of the United States, shall be treated for the purposes of this Act as a foreign article, and, if subject to a duty which is wholly or partly ad valorem, shall be dutiable, except as otherwise prescribed in this part, on its full value determined in accordance with section 402 or 402a of this Act. If such product or such article is dutiable at a rate dependent upon its value, the value for the purpose of determining the

rate shall be its full value under the said section 402 or 402a.

\* \* \* \* \* \* \* \*

Subpart A.—Articles not Advanced or Improved Abroad

*Subpart A headnotes:*

1. The items in this subpart (except item 804.00) shall not apply to any article—

(a) exported with benefit of drawback;

\* \* \* \* \* \* \* \*

800.00 Products of the United States when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means while abroad ........................Free

Subpart B.—Articles Advanced or Improved Abroad

*Subpart B headnotes:*

1. This subpart shall not apply to any article exported—

(a) from continuous customs custody with remission, abatement, or refund of duty;

(b) with benefit of drawback; .

\* \* \* \* \* \* \* \*

3. Articles assembled abroad with components produced in the United States.—The following provisions apply only to item 807.00:

(a) The value of the products of the United States assembled into the imported article shall be—

(i) the cost of such products at the time of the last purchase; or .

(ii) if no charge is made, the value of such products at the time of the shipment for exportation,

as set out in the invoice and entry papers; except that, if the appraiser concludes that the amount so set out does not represent a reasonable cost or value, then the value of such products shall be determined in accordance with section 402 or 402a of this Act.

(b) The duty on the imported article shall be at the rate which would apply to the imported article itself, as an entirety without constructive separation of its components, in its condition as imported if it were not within the purview of this subpart. If the imported article is subject to a specific or compound rate of duty, the total duties shall be reduced in such proportion as the cost or value of such products of the United States bears to the full value of the imported article.

\* \* \* \* \* \* \* \*

807.00 Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting ................. A duty upon the full value of the imported article, less the cost or value of such products of the United States (see headnote 3 of this subpart)"

At the trial, plaintiff called two witnesses, defendant none. The first witness, a licensed customs broker in plaintiff's office, testified that he was familiar with the entry papers herein; that the fish hooks had been entered under item 807.00, although subsequently classified in liquidation under item 731.06; that on November 10, 1969, his office filed Customs Form 3311, the "Declaration for Duty Free Entry of Returned American Products", required by the Bureau for entry under item 800.00; that this form was filed subsequent to entry of the merchandise, and just prior to the trial, in order to comply with the Bureau's requirements for entry under plaintiff's alternative claim, item 800.00; and that all documents required by the Customs Bureau in connection with entry under items 807.00 and 800.00 have been filed.

The second witness testified that Pflueger Corporation exported fish hooks, which were tagged and sorted by size and shape, and lithographed tin sheets from the United States to Hong Kong. The sheets were then cut and shaped into containers, and 40 hooks of assorted sizes were placed in each container. Apart from depositing them on a conveyor belt which "dumped" them into the container, nothing else was done to the fish hooks. The container and hooks are packaged for sales to the occasional fisherman who wants an assortment and does not buy in bulk quantities. The hooks do not sell for a greater amount at retail when in the container than does similar merchandise packed in cellophane. The cost listed as "Sort-

ing & Packaging" on the commercial invoice refers to the operation whereby the hooks are placed in the containers. No claim was made for, nor was any drawback received in connection with, the exportation of the hooks to Hong Kong.

Defendant contends that the imported fish hooks are not entitled to free entry under item 800.00 since they were advanced in value or improved in condition by a process of manufacture or other means while abroad. Defendant urges that they are also precluded from free entry under item 807.00 because they were not "assembled" within the meaning of that provision.

 It is the determination of the court that the fish hooks at bar do come within the ambit of item 800.00 of the tariff schedules. That plaintiff's claim for duty free entry of the fish hooks, as returned American products under item 800.00, is valid may be gleaned from the authorities set forth in Border Brokerage Company, Inc. v. United States, 65 Cust.Ct. 50, C.D. 4052, 314 F.Supp. 788 (1970), appeal dismissed, December 23, 1970, involving the same issue.

In the *Border Brokerage Company* case, tomatoes were exported in 40-pound cartons from the United States to Canada where they were unloaded, unpacked, sorted, graded by color and size, repacked in 18-pound cartons, sold and shipped to customers in the United States at prices higher than those paid by the exporter. There was no intermixing of sizes in the repacking, but about four percent of the tomatoes were culled out as spoiled or broken down. Sustaining plaintiff's claim under item 800.00, Judge Richardson, writing for the court, stated:

"In [Wilbur G.] Hallauer v. United States, 40 CCPA 197, C.A.D. 518 (1953), involving the reappraisement of apples *vis-a-vis* paragraph 1615(g) of the Tariff Act of 1930, as amended, transported to Canada in 35-pound boxes and returned to the United States in 42-pound boxes, our appeals court regarded the wiping (to remove an insecticide spray residue), polishing, grading, wrapping, and packing

of apples in Canada to constitute changes which were sufficient to convert the "apples" *per se* into a different unit of merchandise. But in United States v. Oakville Company, 402 F.2d 1016, 56 CCPA 1, C.A.D. 943 (1968), reversing and remanding in part Oakville Company v. United States, 58 Cust.Ct. 564, C.D. 3052 (1967), involving the application of paragraph 1615(a) of the 1930 Act—the predecessor of item 800.00—to common pins exported to Canada and returned to the United States as pins-in-rolls, our appeals court declined to regard the placement of the pins in paper tape rolls as constituting an alteration of the pins or change in their condition, distinguishing its ruling on this point in *Hallauer* as involving a situation where things were done to the apples in Canada beyond merely placing them in [different sized] boxes as against the situation in the *Oakville* case where nothing whatever was done to the pins to alter them or change their condition as *pins*.

Hence, it would appear from the principles evolved in the *Hallauer* and *Oakville* cases, that the test to be applied in item 800.00 cases is whether the merchandise of American origin has itself (apart from its container) been the object of advancement in value or improvement in condition while abroad.

In the instant case it is clear that nothing more was done to the tomatoes themselves in Canada than that which is entailed in their physical transfer, with selectivity, from one size carton to a carton of a smaller size. And the mere sorting of the tomatoes as found in their natural condition did not advance their value or improve their condition *per se*. United States v. Sheldon, 2 Ct.Cust.Appls. 485, 492, T.D. 32245 (1912). There was no cleaning, wiping or individual wrapping of any of the involved tomatoes in Canada. Under all of the facts disclosed in this record we are of the opinion that the involved tomatoes

have not been advanced in value or improved in condition while in Canada, and that the evidence supports plaintiff's claim * * *." 65 Cust.Ct. at 55, 314 F.Supp. at 791.

The Court of Customs and Patent Appeals in the *Oakville Company* case described the exported merchandise and Canadian processing therein as follows:

" * * * Oakville exported to Canada common pins one inch in length together with rolls of one inch wide paper tape, the rolls being 17 or 18 inches in diameter. The pins were exported in bulk in packages of about 45 pounds each, to a Canadian subsidiary, the De Long Hook and Eye Company of Canada, Ltd. A total of 86,569 pounds of pins were exported for this purpose. De Long, by automatic machines to which the pins and paper tape were fed, put two longitudinal parallel ridges in the tape and simultaneously inserted the pins therethrough at accurately spaced, regular intervals. Lengths of this pin-loaded tape, each containing 5,000 pins, were wound on wooden cores to which circular cardboard side discs were stapled, the discs bearing labels, and these finished rolls of pins were shipped to Monarch in the United States.

* * * Nothing was done to the pins in Canada except to insert them in the paper tape. The paper tape was modified in Canada by the formation of the two ribs in it and the insertion of the pins therethrough." 56 CCPA at 2–3.

In the case at bar, like the pins in the *Oakville Company* case nothing whatever was done to the fish hooks which altered them or changed their condition. Like the tomatoes in the *Border Brokerage Company* case, the fish hooks were merely sorted and transferred from one size container to another. In the words of the trial court in the *Oakville Company* case:

" * * * the common pin remains the common pin, recognizable, marketable, and usable, whether packaged and labeled or not." 58 Cust.Ct. 79, 87, C.D. 2893, 264 F.Supp. 15, 21 (1967).

The same can be said of the fish hooks at bar.

Defendant, however, citing the case of Winthrop-Stearns, Inc. v. United States, 38 Cust.Ct. 1, C.D. 1835 (1956), claims that the fish hooks had been advanced in value because in their imported condition they were suitable for sale at retail. In the *Winthrop-Stearns* case the merchandise consisted of Mebaroin tablets sent to Canada in bulk where they were bottled, 100 tablets per bottle, labeled, and the bottle packed in individual cardboard containers. On their return the tablets were classified as a medicinal preparation. The court overruled the importer's claim for free entry under paragraph 1615(a), as American goods returned, on the ground that the tablets had been advanced in value as they were now available for sale to the ultimate consumer. No appeal was taken by the importer.

The persuasive force or authority of the *Winthrop-Stearns* case has been largely dissipated by the *Oakville Company* case wherein the Court of Customs and Patent Appeals, referring to the *Winthrop-Stearns* case, expressly stated that "we do not consider ourselves bound by it." 56 CCPA at 7. The imported pins-in-rolls in the *Oakville Company* case were not only a "different commercial entity" from the exported pins and tapes, but, in their imported condition, were "used by the ultimate purchaser in the United States * * * to fasten tags on garments by a special machine for which the rolls of pins were arranged with certain specifications." 58 Cust.Ct. at 82, 264 F.Supp. at 18. They were nevertheless held to be duty-free under paragraph 1615(a) of the Tariff Act of 1930.

Thus, absent some alteration or change in the articles themselves, the mere sorting and repacking of goods, even for the purposes of resale to the ultimate consumer, are not sufficient to preclude the merchandise from being classified as returned American products under item 800.00 of the tariff schedules.

Since the court has determined that the fish hooks are properly classifiable

under item 800.00 of the tariff schedules, it is not necessary to consider plaintiff's alternative claim under item 807.00 of the schedules, and to decide whether they were "assembled" as required by that provision. On the question of "assembly", see C. J. Tower & Sons of Buffalo, Inc. v. United States, 62 Cust.Ct. 643, 646, C.D. 3840, 304 F.Supp. 1187 (1969), and United States v. Baylis Brothers Co., 451 F.2d 643, 59 CCPA, C.A.D. 1026 (1971).

In view of the foregoing the claim for duty-free entry of the controverted fish hooks under item 800.00 of the tariff schedules is sustained. Judgment will be entered accordingly.

RICHARDSON, Judge (concurring).

I concur in the result on the authority of National Silver Co. v. United States, 463 F.2d 1387, 59 CCPA, C.A.D. 1064 (August 17, 1972).